(61 App. Div. 266.)

## In re HALL.

(Supreme Court, Appellate Division, Third Department.  May 8, 1901.)

1. MARRIAGE—VALIDITY—CIVIL RIGHTS.

The Civil Code of France requires that a marriage be celebrated at the domicile of one of the parties, and a residence of six months is necessary to constitute such a domicile; that a record of the proposed marriage be made, and two publications thereof, with an interval of eight days between them, on a Sunday, before the door of the town hall; that the consent of the girl's parents, if living, if she be under the age of 21 years, appear; and that the celebration of the marriage be had before a civil officer.  Appellant's mother was placed in a school at Milan, whence, at the age of 19, she eloped with a citizen of the Argentine Republic to Paris, where some

form of marriage service was performed, and after four days went to her husband's home at Buenos Ayres to live. *Held*, that though, under the Civil Code of France (articles 201, 202), civil rights of property attached, no marriage status was created.

2. SAME—EVIDENCE—JUDICIAL NOTICE.
　　The court will take judicial notice that the common law is not, and never was, in force in France, so as to render valid a common-law marriage entered into therein.

3. SAME.
　　Where a woman, a citizen of the United States, married in France to a citizen of the Argentine Republic, and the marriage was invalid both by the laws of France and by the laws of the domicile of the husband, the marriage was invalid everywhere.

4. DIVORCE—VALIDITY—DOMICILE—JURISDICTION.
　　A woman and her father removed to Dakota in 1887, where the former commenced divorce proceedings in April, 1889. From the time of going to Dakota she never left the territory. In her affidavits and complaint in the divorce proceedings she swore she had been a resident in good faith of Dakota for more than 90 days prior thereto, and the order of publication of the summons and the decree recited that she was a resident of such territory. The laws of Dakota require a residence of 90 days before commencing divorce proceedings. *Held*, that she was a resident of Dakota in good faith, and the court had full jurisdiction of such action under the Dakota laws.

5. SAME—REMARRIAGE—LEGITIMACY OF CHILD.
　　Where a wife secures a divorce according to the laws of the place where domiciled, and thereafter marries another, to whom a child is born, such child is legitimate everywhere, though such divorce and remarriage may not be recognized as legal elsewhere.

Appeal from surrogate's court, Albany county.

Action by Lewis B. Hall, as administrator with the will annexed of Susan Benedict, deceased, to determine the title to a trust fund. From a decree entered in the surrogate's office awarding the fund to Antonia Hill Robinson, Howard F. Kingman appeals. Modified.

This proceeding was instituted by Lewis B. Hall as administrator with the will annexed of Susan Benedict, deceased. The controversy is to determine the title to a fund provided for by the second clause of the first codicil of that will. This clause reads as follows: "I give to my executors the sum of $6,000, the interest or income of which is to be paid to my son, Spencer S. Benedict, annually during his life, and after his death to be paid in like manner to his daughter, Antonia Hill Benedict, until her marriage or decease, whichever event may first occur; and, after his death and her marriage or decease, the principal sum to be paid over in two equal shares to her, or her appointees by will, or next of kin, as the case may be, and her sister, Ella Maria Fithian, or her appointees by will or next of kin, if she be not then surviving."

Antonia Hill Benedict married one Charles Robinson in 1868. Spencer Benedict, the life tenant, died in April, 1899. Ella Maria Fithian, the sister of Antonia Hill Benedict, died intestate in July, 1892, leaving an only child, Alice Maude Fithian, who died in 1893, leaving as her only child the infant appellant, Howard Fithian Kingman.

By the decree appealed from the whole fund was awarded to Antonia Hill Robinson. The appellant has been declared an illegitimate son of Alice Maude Fithian, and for that reason his right to the share of his grandmother Ella Maria Fithian under the will has been denied to him. From this decree the infant has appealed.

Further facts appear in the opinion.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

Buchanan & Lawyer, for appellant.

Tracy & Cooper (James Tracy and Frederick Townsend, of counsel), for respondent Robinson.

Hun & Johnston, for administrator.

SMITH, J. Unless the appellant was the illegitimate son of Alice Maude Fithian, and therefore not of kin to Ella Maria Fithian, named in the will, the decree of the surrogate cannot stand.

Edwin Fithian, the father of Alice Maude Fithian, was a retired naval officer. While traveling in Europe, the daughter, Alice Maude, was placed in a school at Milan. From there she eloped at the age of 19 with Alberto Martinez, a citizen of the Argentine Republic. They went to Paris, where they stayed not more than four days, when they departed for the Argentine Republic. At Paris some form of marriage service was performed. At Buenos Ayres they lived as husband and wife for about 18 months, when Martinez sent her to her father, in England, and thereafter refused to live with her or to support her, and deserted her. Thereafter the said Alice Maude came with her father to Dakota, where a judgment of divorce against Martinez is claimed to have been obtained. She thereafter married Richmond Kingman in Dakota, where to that marriage this appellant was born. The surrogate has found that a valid marriage was contracted with Martinez in France, and that the decree of divorce obtained in Dakota was invalid on the ground that the said Alice Maude had not at the time of the commencement of the action established a domicile in the state of Dakota sufficient, under the laws of Dakota, to give jurisdiction to the court to grant a decree.

Three questions, then, require examination: First. Did the surrogate properly hold that a valid and binding marriage had been contracted by Alice Maude Fithian with Alberto Martinez in Paris? Second. Did Alice Maude acquire in Dakota, prior to the commencement of her action, a domicile sufficient to give jurisdiction to the Dakota court to authorize the decree of divorce? Third. If the decree of divorce granted in Dakota was valid in that state, can this infant appellant take property as one of the next of kin of Ella Maria Fithian, under the laws of this state?

1. The record contains the Civil Code of France, by which marriages are regulated. By that law it is required that a marriage be celebrated at the domicile of one of the parties, and a residence of six months is required to constitute such a domicile; that a record of the proposed marriage be made, and two publications thereof, with an interval of eight days between them, on a Sunday, before the door of the town hall; that the consent of the girl's parents, if living, if she be under the age of 21 years, appear; and that the celebration of the marriage be had before a civil officer. It appears in this case that with none of these conditions did the parties comply. They were in Paris not to exceed three or four days before the marriage ceremony claimed. No domicile, therefore, could have been acquired. No publication could have been made in accordance with the laws of France. The father's consent was confessedly wanting. In fact, it is admitted and found by the learned surrogate that the

marriage was not, and could not have been, performed in accordance with the requirements of the Civil Code of France. The marriage is held valid by the surrogate, however, as a putative marriage under a supposed fiction of the French law. The statutory basis of such a finding is contained in the following articles of the Civil Code of France:

"Art. 201. If a marriage has been declared void, not only the parties to the marriage but the issue thereto shall nevertheless enjoy all civil rights resulting therefrom, if the marriage was contracted in good faith.

"Art. 202. If only one party was in good faith, only the party in good faith and the issue of the marriage shall be entitled to the civil rights resulting therefrom."

The surrogate has found that the marriage in France was contracted by Alice Maude in good faith. If it were necessary to review this finding, a serious question is presented,—whether good faith, in the eye of the law, can co-exist with an elopement and clandestinity. Authorities are not wanting which hold that clandestinity is incompatible with the good faith required by law to give civil rights in an illegal marriage. But assume, for the argument, that the attempted marriage was contracted by her in good faith. It is not found, nor could it be found, that there was good faith on the part of Martinez. To him the French law gave no civil rights of the marriage. These sections of the Civil Code are found in a chapter of the Code entitled "Of Actions to Annul a Marriage." There is no other provision of the French law determining what shall be the rights of parties innocent or guilty, to a marriage not contracted with the formalities required by law. The learned surrogate has held that this "putative marriage," as he calls it, constituted a valid marriage, which was a bar to the remarriage of Alice Maude before it was annulled by a court of competent jurisdiction. Is this conclusion correct? While it was undoubtedly competent for the French government so to declare of marriages there celebrated, it has been seen that they have not expressly so declared. Such an important provision in the law, if not expressed, should be found only by necessary implication. In the first place, such implication is not warranted by the sections of the French Code. It might well be inferred that the rights assured to an innocent party to a void marriage upon annulment should belong to such a party before an annulment of the attempted marriage. But those rights are simply the civil rights of property. The purpose of the law in granting civil rights to an innocent party is fully accomplished by according to her and her children the rights of property. It can add nothing to give her a status as a married woman. Such a construc_ion would, and in this case has, worked to the detriment, rather than the benefit, of the person for whose benefit the law was enacted. The very fact that those rights are given only to an innocent party, while withheld from a party not innocent, is, to our minds, convincing of an intent to award to the innocent party only property rights, and legitimacy to the children. The marriage is not declared valid, even though both parties be innocent. Much less could it be if one party only be innocent, and the civil rights of the marriage refused to a guilty party.

Again, this construction is negatived by the Civil Code itself. In article 189 of the French Code it is provided, in an action to annul a second marriage, "If the parties to the second marriage plead the nullity of the first marriage, the validity or nullity of the first marriage must be first decided." From this provision is necessarily implied the right to a party to a void marriage to remarry before the annulment of the void marriage, and to uphold the second marriage, if attacked, by showing the nullity of the first marriage. Had Alice Maude been married to Kingman in France by due formality, in an action there brought by Martinez to annul the marriage she could have upheld her marriage to Kingman, and shown the nullity of the assumed marriage to Martinez, though no judgment of nullity had been obtained before her marriage with Kingman.

Still again, this construction is opposed to the policy of the common law. In those states where licenses to marry are required, an attempted marriage without a license is void absolutely. Either party to such attempted marriage is free to contract any other marriage, and it has never for a moment been supposed or ruled that a void marriage must be annulled by a court before a remarriage. See opinion of Follett, J., in Finn v. Finn, 62 How. Prac. 83.

This question has been thus far considered independently of the opinions of those French commentators who have discussed the interpretation of this law. The views of these commentators are, upon some aspects of the law, widely divergent. The provisions of the Code assume to refer only to marriages which are pronounced null by the judgment of the court. As to whether a void marriage may be deemed a putative marriage before such a judgment, the commentators are not agreed. In some commentaries no distinction seems to be made between marriages which are void and those merely voidable. In the extract from the writings of Mourlon quoted in the opinion of the learned surrogate are statements which, standing alone, would seem to declare a putative marriage valid for all purposes until annulled. But his definition of a putative marriage is, "A marriage which is in reality null, but which has been contracted in good faith by the two parties, or by one of them." Read in connection with this definition, what he has said in reference to the effect of putative marriages can fairly be interpreted to mean that those marriages are valid so far as to impose a civil liability upon either party to the other party, if innocent. As thus interpreted, his views in no way conflict with the conclusion which we have reached, which is based upon the provisions of the French Code itself, as well as upon the analogy of the common law.

The respondent's counsel upon the argument further claimed the marriage in France valid upon the ground that, as neither Alice Maude nor Martinez were residents of France, the French law was not applicable. We are referred to the case of Loring v. Thorndike, reported in 5 Allen, at page 257. In that case an American and a resident of Mayence, in the grand duchy of Hesse-Darmstadt, were temporarily residing in the free city of Frankfort, in Germany. Neither of them ever had any domicile there. Upon making inquiries of magistrates and counsel, they were advised that

they could be legally married before the consul of the United States. There was thereupon a marriage agreement drawn up and signed, and the consul declared their marriage legal and valid. The validity of this marriage was questioned by reason of the fact that it was not performed in accordance with the laws of the city of Frankfort. The court, however, held that the formalities specifically required by the Frankfort law were not applicable to foreigners, but the marriage was valid in Frankfort, "as having been duly contracted according to the prescription of that portion of the common law which had not there been abrogated or repealed." If, then, the common law was in force in Frankfort, as it appears, and if the special marriage laws made did not apply to foreigners temporarily there, the parties were there married in accordance with the laws of Frankfort, and the marriage valid there was valid everywhere. Assuming, then, for the argument, that the formalities required by the laws of France do not apply to foreigners temporarily in France, there is no proof that the common law is there applicable, so as to render valid a common-law marriage. In fact, the court will take judicial notice that the common law is not, and never was, in force in France.

It is further urged that the marriage will be presumed to have been contracted at a consulate. But, to be valid if there contracted, it must accord with the laws of the domicile of the contracting parties. Here the contracting parties had no common domicile. While, perhaps, under the laws of the domicile of Alice Maude a common-law marriage would be valid, not so under the laws of the domicile of Martinez. In the record appear the laws of the Argentine Republic. No facts appear in the record which would justify a finding that the marriage was contracted in accordance with those laws, nor is such a finding claimed. The marriage, then, appears to have been invalid both by the laws of France and by the laws of the Argentine Republic, the domicile of the husband. Alberto Martinez was never married to Alice Maude. He was not her husband. If the conclusion of the learned surrogate be correct, she was a married woman without a husband. This is clearly a legal paradox. There can be no marriage vinculum which does not bind both parties. In Atherton v. Atherton (not yet officially reported) 21 Sup. Ct. 544, 45 L. Ed. ——, Justice Gray, in writing for the United States supreme court, says, "A husband without a wife, or a wife without a husband, is unknown to the law." The assumed marriage, not binding upon Martinez, except possibly to bind him for her support, did not invest her with the status of a married woman. Alice Maude therefore had capacity at any place to contract the marriage with Kingman, and the appellant is her lawful offspring.

We do not here decide whether the French law is applicable to the marriage of foreigners temporarily in France, either as to the formalities required, or as to the civil rights acquired thereunder. Nor do we decide whether under that law civil rights are given to an innocent party to an attempted marriage, in disregard of every formality required by that law. We are unable to find a binding marriage under any law which can be applicable to the conditions here existing, and, even though under the law civil rights

attached to this marriage, such civil rights create no marriage status.

2. The conclusion which we have reached upon the first question discussed disposes of this appeal. Inasmuch, however, as there is another question of fact determined by the surrogate, with which determination we cannot agree, we think it proper briefly to state the grounds of our nonconcurrence. The learned surogate has found that the decree of the Dakota court was not effectual, by reason of the fact that Alice Maude had not acquired a legal domicile in Dakota prior to the commencement of the action. In an affidavit sworn to upon the 13th day of February, 1889, she swore that she was "a resident in good faith of the territory of Dakota for more than ninety days prior to the commencement of the action." In her complaint, sworn to upon the same day, she swore that "she is now, and for more than ninety days last past has been, in good faith a resident of the territory of Dakota, in the city of Fargo, in the county of Cass." In the order for the publication of the sum· mons, under the signature of the district judge, it is recited that it appeared to said judge that the action was brought by the plain· tiff, a resident of the territory of Dakota. In the decree of the court is recited:

"And the court having heard the proofs necessary to enable it to render judg· ment herein, from which it appears to the satisfaction of the court that the plaintiff is now a resident in the county of Cass and territory of Dakota, and that she was, and had been at the date of the commencement of this action, a resident of said county and territory for a period of more than ninety days."

It is found by the surrogate that Edwin Fithian and his daughter removed to Dakota in 1887; the action for divorce was commenced upon the 13th day of April, 1889; the marriage with Kingman in Dakota took place upon the 1st day of July, 1890; the birth of appellant in Dakota, and the death of Alice Maude Kingman upon the 27th day of March, 1893. From the time she went to Dakota, she never once left the state. There is no direct evidence which goes to impeach the good faith of her intention to acquire a domicile. It is true that she went there for the purpose of procuring a divorce, but that purpose is not at all inconsistent, but, rather, accords, with the purpose of acquiring a domicile. In Minor, Confl. Laws, § 90, it is said, "But, if the animus really exists to remain there permanently, the fact that the motive of removal is to procure a divorce is immaterial." There is some evidence in the case from which the court might find that it was not the intention of Edwin Fithian, the father, to remain permanently in Dakota. He distinctly swears, however, that he had no conversation with his daughter in respect to what was his intention, and his intention, therefore, becomes wholly immaterial. A residence of 90 days is required in Dakota before an action for divorce can be commenced. That Alice Maude waited from 1887 to February, 1889, before commen· cing the action for divorce; that she lived there over a year there· after before her marriage, and after her marriage for over three years, until her death,—is to our minds convincing evidence that the bringing of the action was not her sole purpose in removing to Dakota.

By section 2586 of the Code of Civil Procedure it is provided that, where an appeal is taken upon the facts from a decree of a surrogate, "the appellate court has the same power to deride the questions of fact which the surrogate had." In re Warner, 53 App. Div. 566, 65 N. Y. Supp. 1022, it was held by the appellate division of the Fourth department that under this section the appellate court is not limited to the consideration of the question whether there was sufficient evidence to support the decision of the surrogate, but the appellate division should decide for itself whether the surrogate correctly determined the facts. We are of the opinion that the finding of the surrogate is overborne by the clear weight of evidence; that Alice Maude became a resident of Dakota in good faith, and remained such for 90 days prior to the commencement of her action for divorce; and hence that the court had full jurisdiction of such action, under the laws of Dakota.

3. With jurisdiction in the Dakota court to grant the decree established, as to Alice Maude, a citizen of that state, within that state, the marriage relation was dissolved. In Minor, Confl. Laws, § 88, it is said:

"It is admitted that, within its own borders, each state has sovereign control of the persons and property there situated, either permanently or temporarily, subject only to such restrictions as may be placed upon its courts by its own laws or constitution, or by the constitution and laws of the United States. Subject to those restrictions, it is in its power to declare, in any form of proceeding it sees fit, that a married man, resident there, or there temporarily, or even not there at all, shall be there deemed no longer married; and that whether the wife be within or without the state. This is purely a matter of municipal law, with which private international law has no concern; and the status being a reciprocal one, since in that state the husband must be considered to be without a wife, so in that state the woman must be deemed to be without a husband."

This proposition has been distinctly held by our own court of appeals in Lynde v. Lynde, 162 N. Y. 412, 56 N. E. 981. In speaking of a foreign decree obtained without personal service of process, the court says:

"The decree of divorce which the plaintiff obtained in New Jersey was effectual to determine her status as a citizen of that state towards the defendant."

This is also held in People v. Baker, 76 N. Y. 78, 32 Am. Rep. 274. In the state of Dakota, then, after the pronouncement of the decree of divorce the appellant's mother was an unmarried woman, and might lawfully contract marriage with the appellant's father; and within that state at the time of his birth this appellant was clearly a legitimate child.

But the legitimacy of a child, wherever questioned, is determined by its legitimacy at the time and place of its birth. In Minor, Confl. Laws, § 98, in speaking of legitimacy, the rule is stated thus:

"The general rule being that the law of the domicile regulates the status. if the father, mother, and child are all domiciled at the time of the child's birth in the same state, the law of that state will fix the status. It is the law of the domicile at the time of the child's birth which controls, if the claim of his legitimacy is based upon the circumstances of his birth in wedlock, though unlawful."

In Story, Confl. Laws (8th Ed.) § 105, the rule is stated:

"In questions of legitimacy or illegitimacy the law of the place of the marriage will generally govern as to the issue subsequently born. If the marriage is valid by the law of that place, it will generally be held valid in every other country, for the purpose of ascertaining legitimacy or heirship."

But this question is, we think, decisively settled by the case of Miller v. Miller, reported in 91 N. Y. 315, 43 Am. Rep. 669, and the case of Bates v. Virolet, 33 App. Div. 436, 53 N. Y. Supp. 893. In each of these cases an illegitimate child was held to be made legitimate by the subsequent marriage of the parents in a country where such subsequent marriage legitimatized the issue theretofore born. This rule was held for the purpose of inheritance of real estate in the state of New York, notwithstanding such child would not be legitimate under the laws of the state of New York. In Miller v. Miller the cases were carefully examined, and the rule was thus announced:

"Legitimacy, which was conferred upon the plaintiff by the laws of Pennsylvania, to which reference has been had, constitutes a portion of his rights, and accompanies him wherever he may reside. Being legitimate in the state of Pennsylvania, he continued so in every state and in every country where he chooses to establish his residence. The rule seems to be well settled that the rule of the domicile of origin governs the state and condition of a person, in whatever country he may remove to. The status of legitimacy which arises under the laws of one nation is recognized by other nations, according to the authorities."

The learned counsel for the respondent relies with assurance upon those decisions of our court of appeals which hold that a divorce in a foreign state, as against a nonresident of that state, who was not personally served therein or who did not appear, is ineffectual to affect a status of either party beyond the borders of that state. This proposition is unquestionably held by the cases cited. In our judgment, however, it is unnecessary to discuss them; for, as we view it, they are wholly inapplicable to the question here at issue. Neither the status of Alice Maude nor of Alberto Martinez is here in question. The status of the son of Alice Maude alone is at issue. If, as has been recognized by our courts, the decree of divorce in Dakota was effective to establish the status of Alice Maude in Dakota, this child was there legitimate; and if, as has been shown, the legitimacy of this child at the time and place of its birth made it legitimate everywhere, the right to succession is established. Nor can there be any ground of public policy which would preclude our recognizing the legitimacy of this child in Dakota. In the first place, under our own statutes a decree of divorce may be obtained in this state by a resident against a nonresident by the service of the summons by publication. The status, then, that is acknowledged to Alice Maude in Dakota after the divorce is the same status which would be accorded to her in our state, were the divorce granted by our court. But, more than that, to whatever extent public policy may lead the courts of this state to question in this state the relation of Alice Maude to Richmond Kingman, the father of the infant, that public policy has never led the courts of our state to a denial of the status of legitimacy to the issue of that marriage, when legiti-

mate·.where born. In this the humanity of our law, which will protect the innocent from the wrongs of others, outweighs any possible claim of public policy to the contrary; and, for the protection of this child, the court should not hesitate to apply the general rule that his legitimacy in Dakota determined his legitimacy here. Whatever, therefore, may be the status of Alice Maude Fithian under our laws, the legitimacy of her son would seem undoubted. As the legitimate son, he is next of kin to Ella Maria Fithian, named in the will.

It becomes unnecessary, therefore, to discuss the question raised as to the nature of the remainder created by the will. If that remainder be vested, the appellant, concededly, would be entitled thereto, whether legitimate or illegitimate. We have assumed, for the argument, that the remainder is a contingent one, and has passed to the next of kin of Ella Maria Fithian.

The judgment should therefore be modified, on the law and the facts, so as to provide for payment of one-half of the principal of said trust fund to appellant, as next of kin of Ella Maria Fithian, and as so modified affirmed, with costs of this appeal against Antonia Hill Benedict personally. All concur.