ODOM, Justice
 

 (dissenting).
 

 On the question of res adjudicata I adhere to my original opinion. I thought when the case was before us originally and still think the exception of no cause of action should be sustained. I did not discuss that feature of the case because my associates thought it unnecessary.
 

 It is stated in the majority opinion on rehearing that:
 

 “Plaintiff does not pretend, on the above state of facts, that her mother was actually married to Ulisse Marinoni, Jr., and became his lawful wife. * * * Exceptors’ argument that no ceremonial marriage was performed is beside the question. * * * A putative marriage is not founded on the actual marriage or the ceremonial marriage, but on the reasonable belief by one or both of the parties that they were honestly married and that their offspring came from a lawful and honorable union.”
 

 
 *815
 
 When plaintiff alleges that her mother was never actually married to Ulisse Marinoni, Jr., she alleges herself out of court. Her cause of action is based upon the theory that she is the child of a putative marriage between her mother and father. If there was no putative marriage, then she has not inherited from her father and her suit necessarily falls.
 

 The statement in the majority opinion-on rehearing that a “putative marriage is not founded on the actual marriage .or the ceremonial marriage, but on the reasonable belief by one or both of the parties that they were honestly married,” in my opinion finds support neither in our codal provisions, our own jurisprudence nor in the writings of the French authorities.
 

 Our law considers marriage in no other view than as a civil contract (Civil Code, art. 86), and to all contracts there must be at least two parties who agree upon the same thing. There are two essentials to a marriage, and these are that the parties must be willing to contract and do contract pursuant to the forms and solemnities prescribed by law. When the parties are willing to contract, agree to contract and do contract a marriage according to the forms and solemnities prescribed by law, there is a marriage between them. But unless they do contract pursuant to these forms and solemnities, there is no marriage in the sense that term is used in the Code. Parties may be willing to contract and agree to contract marriage, but unless they do actually contract and go through some ceremony evidencing their willingness and agreement to contract, they are not married. Ceremony is the gateway through which the parties enter the marriage state. Our Code specifically provides the mode or method of entering into the marriage state. One of the prerequisites is that the parties must actually contract.
 

 While there are only two essential. prerequisites to marriage, consent and ceremony evidencing that consent, there are three essentials to a valid marriage, to wit, consent, ability to contract, and the contract itself evidenced by some form or ceremony. Civil Code, art. 90!
 

 Parties may be married and not validly married. They may have been willing to contract, agreed to contract, and may have actually contracted pursuant to the forms and ceremonies prescribed by law but still not be validiy married, because of some legal impediment .to their marriage which destroys one of the essentials to a valid marriage, to wit, the ability to contract. Where the first and third essentials laid down by article 90 of the Code are present, that is, where the parties are willing to contract and do • contract according to codal forms and ceremonies, the parties are married, but their marriage is not valid if the other essential, ability to contract, is not present. If the first and third essentials prescribed by article 90 of the Civil Code are present and the second, ability to contract, is absent, the marriage is what is termed in law a “putative marriage.”
 

 Webster defines a putative marriage as “a marriage in
 
 due form
 
 of parties be
 
 *817
 
 tween whom existed any of certain impediments, as consanguinity, either or both acting in good faith.” (Italics mine.) Webster’s New International Dictionary, 1935. A putative marriage is a “marriage which is in reality null, but which has been contracted in good faith by the two parties, or by one of them.” Matter of Hall, 61 App.Div. 266, 70 N.Y.S. 406, 410.
 

 That the term “putative marriage,” as used in article 117 of the Civil Code, refers to one contracted in due form is too clear, I think, for argument. That article does not define “putative marriages,” but regulates the effect of them when contracted in good faith. It reads as follows:
 

 “Putative Marriages. The marriage which has been declared null produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith.”
 

 See Succession of Cusimano, 173 La. 539, 138 So. 95.
 

 This article of the Code uses the word “contracted,” which necessarily relates to the third essential of a valid marriage as defined by the Civil Code in article 90, which is that the parties “did contract pursuant to the forms and solemnities prescribed by law.” Unless the parties have contracted, or “did contract,” there is no marriage, putative or otherwise, and the only way they can contract under our law is to follow the forms prescribed by the Code.
 

 The Civil Code, article 117, says that “the marriage, which has been declared null” produces its civil effects, etc. That the word “marriage” as here used refers to one contracted in due form is shown not only by this article of the Code, but is shown by other articles where the word “marriage” is used. Article 110 under the general heading “Of the nullity of marriages” says that marriages
 
 celebrated
 
 without the free consent of the married persons can only be annulled upon application of both parties or of that one of them whose consent was not free, and where only one is mistaken, he alone can impeach the marriage.
 

 Article 112 says that the marriage of minors,
 
 contracted
 
 without the consent of the father and mother, can not for that cause be annulled
 
 "if it is otherwise contracted with the formalities prescribed by law.”
 
 (Italics mine.)
 

 There can be no “impeachment” or action to “annul” a contract which never existed. An action to annul a marriage is based necessarily upon the theory that the parties did contract a marriage, but that the contract is null, void and of no effect on account of some physical, mental, or legal impediment disqualifying the parties, or one of them, from entering into marital relations.
 

 The Civil Code, article 117, speaks of a marriage “which has been declared null,” meaning adjudged null by a court of competent jurisdiction. The plaintiff claims that she has inherited from Ulisse Marinoni, Jr., her father, and yet says in her petition, and it is said by the court in its majority opinion, that her mother was never in fact married to her father. She says that her mother was in good faith and
 
 *819
 
 thought she was married because Ulisse Marinoni, Jr., told her that they were married. But conceding that her mother thought she was married to her father and cohabited with him in good faith, that furnishes no reason why plaintiff should inherit from her father to the prejudice of his legitimate heirs. A woman who is not actually married and who permits herself to be deceived by a man into thinking she is his wife and cohabits with him under that belief is unfortunate indeed, to' say nothing of her innocent offspring. But the law furnishes no relief to her or to the children. Our courts have granted relief in many cases where -no actual marriage could be proved, but that was upon the ground that the parties had so lived together and held themselves out as husband and wife as to raise the presumption that they were married.
 

 In Succession of Taylor, 39 La.Ann. 823, 2 So. 581, 583, J. C. Taylor and the widow'McFarland were married by formal ceremony in Arkansas, while Taylor’s first wife, Sarah Castelberry, was still living, and they were not divorced. Taylor told Mrs. McFarland that he was divorced from his first wife. All Mrs. McFarland, the second Mrs. Taylor, knew about whether Taylor was divorced from his first wife was what he told her. She married Taylor and said she was in good faith and (flaimed that her marriage to him produced its civil effects as provided in articles 117 and 118 of the Civil Code. Speaking of the trust which the second wife said she imposed in the man she married, Justice Poche, organ of the court, said:
 

 “If such trust can be placed in the declaration of the man who seeks to deceive a woman into a reprobated marriage, it would be different to conceive of a case in which the woman could not be held to have acted in good faith. Such a conclusion would open the flood-gates of legalized concubinage, and the courts, in their eagerness to protect the offspring of null marriages, would thus lend a helping hand to the destruction of the respectability of society by sapping the only safe foundation of the purity of the family.”
 

 That is particularly applicable to the case at bar. The court in the Taylor Case refused to give civil effects to Mrs. McFarland’s marriage to Taylor.
 

 A reading of the cases beginning as far back as Clendenning v. Clendenning, 3 Mart.(N.S.) 438, holding that a putative marriage produced civil effects, will show that in each and every one of them where such ruling was made the cóurt either had before it testimony showing that a marriage had been celebrated in due form or that fact was conceded. The very cases cited by the court in its majority opinion involve marriages shown to have been celebrated in due form of law or that fact was conceded.
 

 One of the cases cited in the majority opinion is Succession of Buissiere, 41 La. Ann. 217, 5 So. 668. The facts in that case were that Romain Buissiere married his niece in contravention of a prohibitory law. The court held that, even so, the law creates an exception in case of marriages contracted in good faith in favor of the spouses, or one of them, and their issue,
 
 *821
 
 but on page 220 of 41 La.Ann., 5 So. 668, 669, the opinion recites that the parties “left the state [Louisiana], and went to Bay St. Louis, Miss.,
 
 where they were the objects of the ceremonies of marriage,
 
 in December, 1882. They subsequently returned home,- lived publicly and avowedly as husband and wife, and had two children.” (Italics mine.)
 

 Another case cited is Jones v. Squire, 137 La. 883, 69 So. 733. This case involves the good faith of the second husband of Ephy Wilson, whose first husband had disappeared. The second marriage was preceded by the issuance of a license and there was a formal marriage ceremony. On page 893 of 137 La., 69 So. 733, 736, we find this language by the court:
 

 “For upholding defendant’s case we would have to believe him when he says that he obtained this license and went through this marriage ceremony knowing all the time that it was a farce.”
 

 The next case cited is Succession of St. Ange, 161 La. 1085, 109 So. 909. That case is not in point. It merely reiterates the general rule as stated in paragraph 3 of the syllabus that “when a man introduces a woman as his wife, calls her his wife, and lives with her publicly as such, marriage is presumed.”
 

 Another case cited is Smith v. Smith, 43 La.Ann. 1140, 10 So. 248, 249. In this case a second wife claimed the marital fourth of her husband’s estate. Her claim was resisted by the heirs of her husband on the ground that the second wife contracted marriage in bad faith. The court said of the second marriage:
 

 “In October, 1889, Alexander Smith married the plaintiff, Jessica McFarland, a young girl living in his immediate vicinity.”
 

 It was evidently conceded that this marriage was in due form of law.
 

 Succession of Curtis, 161 La. 1045, 109 So. 832, 834, is cited to the effect that “a child is presumed to be legitimate until the contrary is shown.” That is true, of course, but legitimacy springs only from wedlock. Boykin et al. v. Jenkins et al., 174 La. 335, 140 So. 495.
 

 In the Curtis Case it was said that “the presumption in favor of marriage and the legitimacy of children is one of the strongest known to the law.” There is no presumption of marriage or of legitimacy involved in the case at bar. Plaintiff says, and it is said in the majority opinion, that there was no marriage.
 

 Besides the cases cited in the majority opinion there are numerous others which have to do with putative marriages. In Hondlenk v. John, 178 La. 510, 152 So. 67, 68, it was conceded that the second marriage was lawfully contracted and the court said:
 

 “We are therefore of opinion that the second marriage of the mother to Eugene Robins was
 
 contracted
 
 in good faith and in the honest belief that her first husband was dead; and was therefore a putative marriage and produced all the civil effects of marriage.” (Italics mine.)
 

 
 *823
 
 The court here uses the word “contracted” with reference to this marriage.
 

 In McCaffrey v. Benson, 40 La.Ann. 10, 3 So. 393, the court said the parties went through a “marriage ceremony.” The marriage was declared null on the ground that the plaintiff was incapacitated from contracting a lawful marriage. McCaffrey v. Benson, 38 La.Ann. 198. The second marriage of plaintiff was especially referred to by the court as a putative marriage. The court' held that even though the marriage was a nullity because at the time it was contracted by them the husband had a living wife from whom he was not divorced, yet.the marriage was given its civil effects in so far as the wife was concerned, she having contracted the same in good faith.
 

 A further review of the cases is unnecessary. I cite, however, the following: Patton v. Cities of Philadelphia & New Orleans, 1 La.Ann. 98; Succession of Navarro, 24 La.Ann. 298; Jerman v. Tenneas, 44 La.Ann. 620, 11 So. 80; Succession of Benton, 106 La. 494, 31 So. 123, 59 L.R.A. 135; Miller v. Wiggins, 149 La. 720, 729, 90 So. 109.
 

 Referring now to the French authorities cited in the majority opinion, a reading of thé quotations will show that in a majority of them referencé was made to marriages “contracted” or “celebrated.” For instance, the quotation from Planiol, Droit Civil (3d Ed.) found at the bottom of page 10 of the opinion, is as follows:
 

 “Good faith consists in being ignorant of the cause which prevents the forms of the marriage or the defects of its celebration which caused its nullity.”
 

 I think the judgment sustaining the exception of no cause of action should be affirmed, as well as that sustaining the plea. of res adjudicata.