(69 South. 733)

No. 21169.

## JONES et al. v. SQUIRE.

(June 29, 1915. Rehearing Denied Oct. 18, 1915.)

*(Syllabus by Editorial Staff.)*

1. MARRIAGE ☞40 — PRESUMPTIONS — GOOD FAITH.

On an issue of good faith of the parties to a marriage entered into more than 10 years after the mysterious disappearance of the former husband of one of them, any doubt is to be resolved in favor of good faith of the parties.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. ☞40.]

2. MARRIAGE ☞54 — MISTAKE OF LAW — "GOOD FAITH."

"Good faith" in a marriage contracted more than 10 years after mysterious disappearance of former husband of one of the parties requires an honest and reasonable belief that the marriage is valid, and that there is no legal impediment, and good faith may be based on a mistake of law as well as on one of fact.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 93–103, 105, 106, 109; Dec. Dig. ☞54.

For other definitions, see Words and Phrases, First and Second Series, Good Faith.]

3. MARRIAGE ☞50—EVIDENCE—SUFFICIENCY.

Evidence *held* insufficient to show bad faith of parties to a marriage contracted more than 10 years after the mysterious disappearance of former husband of one of the parties.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. ☞50.]

4. MARRIAGE ☞54—VALID MARRIAGE—GOOD FAITH—EFFECT.

A marriage contracted in good faith between parties, the former husband of one of whom had disappeared more than 10 years prior to the marriage, though in fact illegal, produces all the legal effects of a valid marriage, including the community of acquets and gains between spouses.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 93–103, 105, 106, 109; Dec. Dig. ☞54.]

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge: Harney F. Brunot, Judge.

Action by Amelia Jones and another against Pompey Squire. From a judgment for defendant, plaintiffs appeal. Judgment set aside, new judgment entered, and cause remanded for further proceedings.

John Fred Odom, of Baton Rouge (Bird & Bird, of Baton Rouge, of counsel), for appellants. Charles A. Holcombe, of Baton Rouge, for appellee.

PROVOSTY, J. The parties to this suit are colored, and so are all the witnesses upon whose testimony depends the question of the good faith of the plaintiff's mother in marrying the defendant while her first husband was still living, upon which good faith the right of action of plaintiff, as heir of her mother, depends.

Shortly after the war, October 1, 1865, on the Perkins plantation, about two miles from the city of Baton Rouge, plaintiff's mother and father, Ephey Wilson and Nelson Smith, two ex slaves, were married. The latter, now an old man living in Texas, whose testimony was taken by commission, says that he was charged with "knocking up" the girl and forced to marry her. He soon abandoned her. How long after the marriage is variously testified to. We gather that it was when plaintiff was a baby just beginning to

"sit up." He went to New Orleans, and enlisted in the federal army. He himself says that his wife accompanied him as far as New Orleans and knew of his enlistment, but as a matter of fact he departed mysteriously; simply disappeared. Joe Foster, 60 years old, minister of the gospel, who, for the five years immediately following his disappearance, lived in the same cabin with Ephey on the Perkins plantation and for 15 years continued to live on the place, says:

"It was the general understanding and belief among the colored people around here that he had disappeared, left the country. Never knew, never heard, where he went."

Melinda Perry, who lived on the Perkins place and witnessed the marriage, says:

"I heard he had gone away, but I don't know where he went. I never did hear. Q. You never did hear where he went? A. No, sir; never heard."

Wilson Foster, who lived on the Perkins place, and witnessed the marriage, says:

"From the time Nelson Smith disappeared, never saw or heard of him."

Jake Brown, who lived on Perkins' place and witnessed the marriage, and in fact, occupied one end of a cabin while Nelson and Ephey occupied the other, says:

"Q. What became of him? A. He disappeared away, and nobody ever knew where he went or why he went. Q. You mean you don't know? A. No, sir, I don't know. His own mother, she never could get any answer from him that I ever heard of, and I never heard tell of him or nobody else—never did hear tell of why he disappeared or where he disappeared."

Mollie Williams, who lived on Perkins' place and witnessed the marriage, says:

"Q. Where did he go when he left? A. I don't know where he went. Q. Do you know when he disappeared? A. No, sir. I don't know, but I know when he went off the place. Q. And at that time you knew that he had gone somewhere? A. Yes, sir; gone somewhere."

It is next to incredible that the wife and baby of this young man could have gone to New Orleans with him, when he there enlisted as a soldier in the United States Army, and the gossips in the negro quarters of this plantation not have known of it.

Fourteen years later, on the 8th of July, 1880, Ephey and the defendant were married. The defendant attended in person to obtaining the license. And from that time up to the death of Ephey, in March, 1913, for near 33 years, they lived, and labored and moved in their social world, together, as lawful husband and wife, and his large means for a colored man made them prominent in the community; and he buried her as his lawful wife, attending the funeral and listening to the minister's eulogy of her many virtues as a wife and a woman—all without a breath of question from any quarter, of the regularity or legitimacy of the marriage.

After Ephey has been buried and cannot testify to her own good faith, and the defendant is confronted with the rights of her daughter by the former marriage, he says of her that at the time of her marriage she told him that her husband had enlisted and gone to Texas, and that she had gone as far as New Orleans with him, and remained there with him while he was training for the army and until he went to Texas, and that he had supported her and her child up to 1871. And he adds that for six or seven months before his own marriage to Ephey, they lived together in a house on Laurel street in Baton Rouge, and that it was she and not he who was solicitous about the marriage; that he himself was wholly indifferent about it; wanted to write to the husband, or make inquiries about him, but that she objected to his doing so.

In this statement as to cohabitation, he is contradicted by Belle Jackson, who at that time was the roommate of Ephey, and also by plaintiff, who was then 13 years old and lived with her mother. He is corroborated, however, by his brother, Ike Squire.

In his examination touching the circum-

stances under which he obtained the marriage license, defendant testifies that he informed the clerk of court of the woman being already married, and of her not knowing how long it was since she had heard of her husband, and whether he was dead or not, and that the clerk told him that he, Pompey Squire, would be safe if the last news from the husband had been 5 years past. He adds that all he cared for at that time was to make sure that he could not be prosecuted for bigamy; that she had no reason to believe the man was dead; that it might have been his own idea and intention in good faith that their marriage should be legal and valid, but it did not look as if there was the same good faith on her part because she would not let inquiry be made for the man; that his reason for not calling the marriage off was because he had promised and was—

"strong to my word, and thought it wouldn't bother me—if he comes back it is still his wife."

Further on he says:

"I thought it was a bad condition, and I made the proposition to her that, of course if the other man come back she would have to go with the other man, because she is his wife. If she was here to-day she would answer the same words what I am speaking to you now. I made to her just like that—that if the other man come he would have to have her because no woman can hold two husbands in the same territory—that is the law."

He testifies that she told him that she had remained with her husband in New Orleans while he was training for the army; that they went to New Orleans by the train.

All these statements as to what she told him are entirely inconsistent with the distinct recollection of the several witnesses already referred to, who lived in the same quarters, and some in the same house with Ephey, and were in daily contact with her, who testify that the husband simply disappeared. These witnesses, and other witnesses to whose testimony we will now refer, who like them were the associates of Ephey,

say that she always told them that she did not know what had become of her husband. First of all, there is plaintiff, who always understood from her mother that she did not know where her husband was. Next, there is the sister of Ephey, who lived with her for a time, who always heard Ephey say she did not know what had become of her husband. Then, Judy Williams, who was the secretary of the church to which Ephey belonged, and as such, received and distributed the letters, who says that in 1871, Ephey received a letter from the mother of Nelson Smith.

"Q. What did the letter say? A. Well, just inquiring from her, as far as I can recollect, saying she wanted to know where her son Nelson was; that he didn't write to her and didn't let her hear from him no more, and then she says to me: 'Well, you can tell her where he is; I don't know myself.'"

She remembers the date of this letter because that was the year she was secretary of the church. This witness says Ephey often told her she had not heard from her husband since he left, and did not know where he was, and would go to him with her child if she did.

Next is Andrew Williams, husband of Ephey's aunt, who always heard Ephey say she did not know what had become of her husband. Belle Jackson, who at the time of Ephey's marriage to defendant was her roommate, makes the same statement.

Opposed to this is the testimony of defendant and of his brother, Ike, and of Nelson Smith, the husband, and of Sallie Williams, Ella Young, and Ella Lewis.

Ike Squire says that he lived at one time with his brother, and that Ephey often told him that Nelson Smith had been mustered out of the army.

"Q. Did she say she had heard from him; got a letter? A. She got several letters, but she could not read, and would have to go to other people to get them read for her. She said she knew where he was. Q. Did she ever say who read that letter? A. If she did, I

·don't remember it. Q. But you are sure that she said she got it when he was mustered out of the army? A. She said that they told her he was mustered out of the army. Q. That the letter told her that; who told her that? A. If she told me, I have forgotten."

An effort is here made to substantiate by this witness defendant's theory that Ephey got a letter from her husband in 1871, announcing that he had been mustered out of the army; but, instead of testifying to that one single letter received in 1871, and which according to the defendant was from the husband announcing his having been mustered out of the army, this witness testifies that she got several letters, and that "they," meaning people in general, had told her that ·he had been mustered out of the army. Whether he knows, of his own knowledge, of these letters, is not stated.

Sallie Williams testifies that she and Ephey would work together alone in defendant's field—

"and eat a watermelon, and she would sit down and tell me that her husband had went off to the army, and that a letter had come, and that Sister Amelia Foster read the letter to her."

Ella Young says she knew Ephey in the last two years of her life, and that she heard her say that her first husband had gone off in the army.

"Q. Did you ever hear her say whether or not she heard from him? A. She said she got a letter. Q. Did she say who read that letter? A. Yes, sir; Amelia Foster."

This witness lives on defendant's plantation.

Ella Lewis testified that 14 years ago Ephey told her that she, Ephey, had been married once before and had a grown daughter, and that her first husband had gone off in the army, and she had "heard from him one time" by a letter which Amelia Foster had read to her.

Amelia Foster remembers that Ephey re-ceived a letter in 1871, and brought it to her to be read, but that the handwriting was so bad she, unaccustomed to reading handwriting, could not read it; that she does not know from whom the letter was, but that Ephey said it was from her husband; that she remembers the year because it was that year she moved to near the road near the car track.

We are satisfied from all this testimony that Ephey did receive a letter in 1871, but that it was not from Nelson Smith, but from his mother.

After the testimony in the case had been closed, it was reopened for the purpose of taking the testimony of Nelson Smith. He testified: That when he left to join the army his wife accompanied him to the boat, and that she afterwards joined him in New Orleans and remained there one month with him. That he got no pay until he got to Texas, and sent her then $20, but that, not having heard from her about it, he sent no more. Then he wrote her from Indianola, Tex., in 1867, and got an answer from her at Ft. Stockton, Tex., in 1868. That he got two letters from her and wrote her several. That she said she was doing very well. That his mother died in 1869.

While plaintiff and her witnesses knew, according to their testimony, nothing of Nelson Smith or of his whereabouts from the time he left or disappeared in 1867, the defendant and his witnesses had heard Ephey say that Ephey had told them that he had at that time enlisted. Defendant's learned counsel argues, how could defendant have known of this enlistment, of the muster out in 1871, and of Ephey's having gone to New Orleans, if Ephey had not told him so. The answer is that defendant's learned counsel received a letter from the War Department, informing him that Nelson Smith had enlisted at Baton Rouge in 1866, and had been

mustered out in 1871 at Ft. Clark, Tex.; and as, in all likelihood, all the colored men who enlisted at that time were taken to the headquarters in New Orleans, the extreme probability is that every negro of defendant's age was familiar with that fact. Nelson Smith testifies that 32 went to New Orleans on the same boat with him. But defendant's statement is that Ephey told him she had accompanied her husband to New Orleans, and that they had gone by train; whereas Smith testifies that he went down alone, and that she afterwards joined him. If defendant was inventing, it was natural for him to make Ephey say that she had gone by train, for that is at present, and for some time past has been, the sole mode of passenger travel from Baton Rouge to New Orleans; but in 1866 there was no train service between Baton Rouge and New Orleans, a circumstance which Ephey must have lost sight of if she ever made the statement. It was a likely thing, also, that a colored woman should accompany her husband as far as New Orleans, if he was going there to enlist as a soldier, and that she should remain there as long as he did; and that circumstance, too, was a pretty safe one to guess at, if defendant was inventing.

On the other hand the learned counsel of plaintiff attracts attention to the fact that, if defendant's knowledge of Nelson Smith's having enlisted had antedated and not followed the information of that fact received from the War Department, his counsel would not have waited from May 3d, when the suit was brought, until June 28th, when he wrote to the War Department, for information as to Nelson Smith's enlistment and whereabouts.

[1, 2] Our learned brother below gave no reasons for judgment, but, we infer, was induced by Nelson Smith's testimony to give judgment for defendant; if, so, he gave, we think, too much weight to that testimony. Nelson Smith would lay the blame on his wife for their final separation and his remarriage. He would like to make it appear —in fact, says so—that she knew all the time where he was, whereas he did not know where she was; that she did not answer his letters. As a matter of fact, she was all the time with their child among her relatives and friends on the Perkins plantation where he had left them; and later on in the nearby city of Baton Rouge; and the overwhelming weight of the evidence is that he disappeared mysteriously. And if there were any doubt in the matter, it would have to be solved in favor of the good faith of the parties. Succession of Navarro, 24 La. Ann. 298; Gaines v. City of New Orleans, 6 Wall. 642, 18 L. Ed. 950.

"The good faith referred to means an honest and reasonable belief that the marriage was valid and that there existed no legal impediment thereto." Smith v. Smith, 43 La. Ann. 1148, 10 South. 248. Nelson Smith had been gone for 14 years. He had mysteriously disappeared. Defendant took advice as to the legality of the marriage. He said that he did this for his own protection. But there was no occasion for seeking advice as to his own protection; whereas there was for hers. He admits having told the clerk of court that the woman had already been married, and did not know whether her husband was still living or not. But he denies that the clerk told him that if she had had no news of her husband for 10 years she might legally remarry. Two witnesses testify, however, that he told them that the clerk had so informed him. And the probability is that the clerk so believed, for he would not otherwise have issued the license. And the probability is that he so informed defendant, and that defendant so informed Ephey. That this was an error makes no difference; for good faith

in such a case results from an error of law as well as from an error of fact. Succession of Buissiere, 41 La. Ann. 217, 5 South. 668.

[3, 4] For upholding defendant's case we would have to believe him when he says that he obtained this license and went through this marriage ceremony knowing all the time that it was a farce, and that the woman knew it too, and that this same knowledge was present all the time during the 33 years of continuous and unbroken public matrimonial life. We would rather believe that the advice at the time of obtaining the license was taken at the instance of the woman, and that she married thinking she had a legal right so to do. And, this being the case, the marriage produced all the legal effects of a valid marriage, and, among them, the existence of the community of acquets and gains between the spouses. C. C. arts. 117, 118, 2399.

We assume there will be little difficulty in effecting the partition that is sued for by plaintiff, and will remand the case for that purpose.

It is therefore ordered, adjudged, and decreed that the judgment appealed be set aside, and that there now be judgment recognizing the plaintiff, Amelia Jones, as being the owner of one-half of the property acquired by the defendant, Pompey Squire, during the existence of his marriage with the mother of plaintiff, Ephey or Delphine Smith, and entitled to all the rights flowing from such ownership, and that defendant pay the costs of this suit, and that the case be remanded to be proceeded with, for the lower court to ascertain, either on the evidence already taken or on further evidence, what property is thus owned, and what are the rights flowing from such ownership, and to render judgment and proceed to effecting a partition accordingly.