Statement of the Case.
MONROE, C. J.
Plaintiffs, seven in number, appearing as the children and sole legal heirs of Jean Pierre Miller, deceased, issue of his marriage with Florestine Fusilier, his predeceased wife, proceeded o by rule against the sheriff and ex officio tax collector of the parish of Evangeline, requiring him to show eáuse why they should not be put in possession, without paying any inheritance tax, of a certain tract of land which had belonged to the community of ac-. quets between their parents, and of other tracts which their father had acquired after the death of their mother. And thereupon Caroline Guillory Miller and Octave Miller, an emancipated minor, intervened in 'the proceeding, by way of opposition, alleging:
That Jean Pierre Miller obtained a judgment of separation a mensa et thoro from Florestine Fusilier on October 15, 1895, and that, on March 15, 1S9S, the opponent first named was married to him, on his representation that he had obtained a final divorce from Florestine Fusilier, and that opponent acted in absolute good faith, believing him to be a divorced man, both from his “representations and those of others in whom she had confidence, and she lived with him as his wife from the date of their marriage, as aforesaid, to the time of his death, all the time believing that she was his true and lawful wife * :S * ; that there were born to opponent, * * * as the result of said marriage, two children, namely Octave Miller and a minor, Rovilion [who died after the filing of the opposition] ; * * * that all of the property described in the aforesaid application * * * was acquired during his (decedent’s) putative marriage with opponent, save * * * the property described in i>aragraph 1 [which was acquired during the first community], * * * and fell into the community * * * which existed between them, and that therefore she is entitled to an undivided one-half of said property, and the two children born of said putative marriage * * * are entitled to their pro rata share with the children of the first marriage, in the other half of the property.”
The paramount (and, it may be said, only) question of practical importance that the case presents, therefore, is whether Caroline Guillory (at that time widow of Ozeme David, with five children, issue of their marriage) contracted the marriage with Miller in the honest belief that he had. been finally divorced from Florestine Fusilier and was free to marry again.
Miller, Fusilier, and Guillory appear to have been illiterate; the two first named were married in 1SS2, and affixed their marks instead of tlieir signatures, to the procés verbal of their marriage; and Guillory affixed her mark to the marriage contract which she and Miller entered into in 189S, to which lie appears to have signed his name, though it does not appear that his knowledge of writing went farther than that; and the same may be said of a large proportion of the 25 or 30 witnesses *723 who were examined in the case. Their ignorance of legal terms and proceedings was profound; so much so that one of the counsel remarked, in the course of the trial, that they seemed-to think that a divorce was something that might be carried around in a basket, and Florestine Fusilier’s reason for believing that Miller had not obtained a divorce from her seemed to be that she had never consented to, and had not “signed,” it. Apart from that, the facts disclosed by the record are: That Miller and Fusilier were married in 1SS2 and lived together for seven or eight years, at the end of which time he left her and they lived separate for (probably) some months; that they then again lived together for three or four years, when he again left her, and, on December 2, 1S94, brought suit for separation from bed and board, alleging that she abused and vituperated him, was of a jealous disposition, was never pleased with what he did, and that their living together had become unendurable. He also prayed for the custody of their seyen minor children. There is testimony to the effect that a deputy sheriff called at her place of residence and offered to serve papers of some kind on her, and that, upon her refusal to receive them, he left them ; but she was unable to read them; she had no money; she lived 20 miles from the courthouse, with no means of getting there, and so, she made no ai>pearance in the ease for nearly two years, at the end of which, on September 8, 189G, the following answer was filed on her behalf by a respectable member of the bar. to wit:
“That she admits her marriage to the plaintiff hut denies all the other allegations of said petition. Wherefore she prays to be hence dismissed, with costs; and for all anti general relief.”
What evidence urns offered does not appear, but on October 15, 1896, there was judgment for plaintiff, decreeing a “separation a mensa et thoro,” condemning defendant to pay the costs, and concluding as follows:
“This done, read, and signed in open court, this 15th day of October, A. D. 1896,' at chambers by consent of all parties.”
And we find a return by the sheriff showing that a copy of the judgment so rendered was served on defendant on February 25, 1898. One of the witnesses called- by opponent (Landry Soileau) gave the following testimony:
“She [Florestine] told me that she wanted to got information; that she had got a notice that Jean Pierre Miller was claiming a divorce, and claiming the seven children; if it was only the divorce, she did not mind. but. if it was for the children she did not want to let them go."
Other witnesses called by plaintiffs in rule testified that she always said that there had been no divorce; that she had never “signed,” or consented to, a divorce; and others again testified that Miller told, tliem, and that it became generally believed, that he had obtained a final divorce.
The opponent was asked how it was that she married Miller, knowing that his former wife was living, and her answer and examination as a witness proceeded in part, as follows:
“A. Because he had told me that everybody would tell me — he came for a good time before and then he told me that ho was going to get a divorce, to get married to me, and then he came and told me the divorce was complete and he was ready to get married. Q. When he asked you to marry him, did you speak to your father about it? A. Yes, sir; certainly; my father told me he was divorced, and it was only that hindered me to marry him; * * * he was divorced. Q. Then, when you married him, you married him as a divorced man. A. I am certain he was divorced, because the day I was married he gave me a certificate of his divorce, and then he gave it to the judge, and he read it to me, and he translated it in French for me, and I am certain that he was divorced; and that paper was in my papers and it stayed until he was on his deathbed, and it is not there any more; I have had papers taken away from *725 there * * * Q. Are you educated — can you read and write? A. No, sir. Q. "Were any of your relatives present on the day that you were married, and if so, who? (Objection and rul-ing.) A. Yes, sir; there was my brother, Octave Guillory, and two others — Paul Fusilier and Alpheus Fusilier — and the wife of Paul Fusilier, my sister, and the wife of Achillé Fontenot were there.”
On cross-examination the witness gave the following, with other, testimony:
“Q. I believe you testified that Jean Pierre Miller told you that he was suing his wife for a divorce? A. Yes. sir. Q. And lie was paying attention to you at that time? A. lie was visiting me — he said he had neglected a little thing, in finishing it. and he would finish it. Q. He told you when he finished his divorce, he would marry you? A. Yes, sir. * * * Q. You knew this proceeding was in Opelousas? A. Yes, sir; I knew there was one. but I had no idea of marrying him when he started it; I didn’t know him when he started it. * * * He had no wife when I married him; for three years he had had no wife. * * * Q. While calling upon you, he told you that after he had gotten this matter straightened out he would marry you? A. 1-Ie told me there was a little point in his divorce which he had neglected, and he only had to go to Opelousas to complete it, and then he would bo divorced — it was something he had neglected; that was all that was missing; he explained what it was, but I cannot say now what it was. (Re-examined.) Q. When you married Mr. Miller, you each had a house? A. lie had a place and I had one; his place was in his home, but it was not paid for. * * * Q. After you were married, to which home did you go to live — at his home or yours? A. At mine. Q. IIow long did you continue to live at your house? A. For 22 years — until he died; he died in January, and it has been 22 years.”
According to the marriage contract, the net value of Miller’s estate at the time of the second (putative) marriage was $266, and that of the estate of the other contract-ant was $655. At Miller’s death, the assets of the second community 'were said to be worth from $25,000 to $35,000, and the tract acquired during the first community “not more than $10,000.” Within a few days after he had put his first wife and their seven children out of the house in which they had been living (into a smaller house near by), Miller took into the house with him a woman of rather bad character, who stayed there until she died some five months later. His wife and children seem, in the meanwhile and thereafter, to have fared badly, and, though miserably poor, to have received no assistance from him. It is said that the particular justice of the peace who officiated on the occasion of the second marriage was employed because he had agreed with Miller to make no charge for his services. The trial judge was of opinion that both Miller and the widow David were in good faith, and honestly believed that Miller was divorced from his first wife when the second marriage was contracted. We concur in that view, so far as widow David was concerned, but are of opinion that Miller knew perfectly well at the time of the second marriage that he had obtained no final divorce from his first wife; that that was “the little thing” that he had neglected; and that, in all probability, his reason ior not obtaining the final divorce, to which he would have been entitled, upon the basis of the judgment of separation a mensa et tlioro, merely upon proving that there had been no reconciliation between him and the defendant, was that he did not have, or did not care to part with, the fee which he would have had to pay a lawyer to obtain the final judgment. It would be out of the question to suppose that the counsel who obtained the judgment of separation failed to -inform Miller, who intended to marry again, that he would not be free to do so until after the expiration of a year and the obtention of another judgment. Our conclusion, upon that point, however, does not affect the result, as to the litigants before the court. Miller was regarded in the community in which he and the parties and the witnesses lived as a truthful man, and there is not a word in the record to show that any of them did not ac *727 cept, or would not have accepted, as true his statement that he had obtained a final divorce. One of the witnesses, called by plaintiffs in rule, who was quite young at the time this suit for separation was pending, testified that Madame Florestine said to her. on different occasions, both before and after Miller’s second marriage, that she did not believe that he had a divorce.
“She always spoke,” says the witness, “as if she did not believe — she always said she had not signed a divorce, and she said, ‘if they are married, he stole my divorce from me. * * * ’ I will explain why I believed him more than I did her — she was a woman without defense and money, and he would go and ask for a divorce, and he claimed that it took him a year to get his divorce. After he came and said that he had it, ho did not go back to see about it. I was young and did not know much about divorces. I believed it.”
' Madame David (as she then was) had not only the reason that the witness assigns for believing that the divorce had been obtained, but the additional reason that' her father, her brother-in-law, and friends told her that it had been obtained; and they testify that they believed it, because they heard it from Miller, himself, and others, and had no reason to doubt it; the fact being that Miller was moving around socially as a divorced man, was accepted as such without question from any one; and the denials of Mrs. Florestine were not reported to Madame David.
Opinion.
[1, 2] The law applicable to the case is found in the following articles of the Civil Code, to wit:
“Art. 117. * * * The marriage which has been declared null, produces, nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith.
“Art. 118. * * * If only one of the parties acted in good faitli, the marriage produces its civil effects only in his or her favor and in favor of the children born of the marriage.”
Those articles, being literal translations of articles 201 and 202 of the Code Napoleon, the views of the French writers concerning the proper interpretation of the latter are equally applicable to the former (McCaffrey v. Benson, 40 La. Ann. 15, 3 South. 393), and the consensus of opinion among those writers seems to be as thus expressed in 1 Planiol, Droit Civil, 3d Ed. (translation by opponent’s counsel), to wit:
“No. 1096. Good faith consists in being ignorant of the cause which prevents the formation of the marriage or the defects in its celebration which caused its nullity.”
“No. 1100. Formerly good faith alone was not sufficient. It was necessary, besides, for the party pleading it to show a just cause for having fallen into error.
“No. 1101. Modern jurisprudence does not exact this condition, because the text of the law speaks only of good faith.”
To the same effect are 2 Baudry-Lacontinerie et Houges-Fourcade (2d Ed.) Nos. 1898, 1S99; 5 Aubry & Rau, vol. 7, § 60, text and note 5.
In Smith v. Smith, 43 La. Ann. 1148, 10 South. 250, this court, after quoting the articles 117, 118, supra, said:
“The sole condition prescribed by the law to give civil effects to a putative marriage is good faith on the part of one or both the parties. Without assuming to legislate, we cannot add to the requirements of the law.”
The court, then, cites Succession of Taylor, 39 La. Ann. 823, 2 South. 581, Barfield’s Case (Harrington v. Barfield) 30 La. Ann. 1297, Navarro’s Case, 24 La. Ann. 298, Abston’s Case, 15 La. Ann. 137, and Patton v. Phila. 1 La. Ann. 98, in support of the interpretation that—
“The good faith referred to means an honest and reasonable belief that the marriage was valid and that there existed no legal impediment thereto.”
And, as it was with that sort of belief that we find Madame David to have been inspired concerning her marriage with Jean Pierre Miller, we conclude that, as to her and her children, that marriage was a putative marriage and she a putative wife, and *729 that she and her children are entitled to the same civil rights as though the marriage were in all respects valid.
The judgment appealed from is therefore Affirmed.