### KING v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. January 11, 1927.)

No. 2510.

Army and navy ⬤⟹51½, New, vol. 12A Key-No. Series—Birth of bastards held convincing evidence of "open and notorious illicit cohabitation," terminating right to installments under war risk policy (War Risk Insurance Act, § 22, as added by Act Oct. 6, 1917, § 2 [Comp. St. § 514mmm]).

Birth of three illegitimate children to widow of deceased soldier *held* convincing evidence that she was living in "open and notorious illicit cohabitation" with another, within War Risk Insurance Act, § 22, as added by Act Oct. 6, 1917, § 2 (Comp. St. § 514mmm), terminating her right to installments under husband's war risk insurance policy.

In Error to the District Court of the United States for the Western District of North Carolina, at Charlotte; Edwin Y. Webb, Judge.

Action by Pearly Torrence King against the United States. Judgment for defendant, and plaintiff brings error. Affirmed.

Joseph W. Ervin, of Charlotte, N. C. (Carswell & Ervin, of Charlotte, N. C., on the brief), for plaintiff in error.

Thomas J. Harkins, Asst. U. S. Atty., of Asheville, N. C. (F. A. Linney, U. S. Atty., of Charlotte, N. C., and Frank C. Patton, of Morganton, N. C., and Kenneth J. Kindley, of Charlotte, N. C., Asst. U. S. Attys., and William Wolff Smith, Gen. Counsel, U. S. Veteran's Bureau, of Washington, D. C., on the brief), for the United States.

Before WADDILL and ROSE, Circuit Judges, and SOPER, District Judge.

ROSE, Circuit Judge. The plaintiff in error was plaintiff below and will be so called here. She is the widow of one John King and the beneficiary designated in his war risk insurance policy. He entered the army in September, 1918, and died in the succeeding January. For something over three years thereafter she received from the government the monthly installments of $57.50 each, payable under the policy, but in 1922 it notified her that in its view she had forfeited her rights under it by open and notorious illicit cohabitation with one Holt. Thereafter the payments were made to the mother of the deceased soldier. The plaintiff brought this suit to recover the installments which had been withheld from her. The government counterclaimed for those paid her subsequently to March, 1919, when her improper relations with Holt began.

She was the first witness in the case, and at the close of her testimony the learned District Judge concluded that, in view of the story she herself told, it would be a waste of time to go further. He accordingly then and there instructed the jury to return a verdict for the government. Was he right in so doing? There are other assignments of error, but plaintiff's counsel frankly says that it will be unnecessary to consider them, unless we are of opinion that the account the plaintiff gave of her life left an issue for the jury.

She testified that she was married in 1917 and lived with her husband until he went into the army. Some 15 months after her marriage a child was born to them. A month or so after her husband's death, she began to receive the attentions of Holt, and in another month, having as she says his promise of marriage, she permitted him a single act of sexual intercourse. As a result a child was born. Holt was employed by a travelling circus, and shortly after the intercourse referred to his occupation took him away from the city in which she was living. He wrote to her occasionally, and sent her some money for the

expected child. She says she never wrote to him, because, as the circus was moving from place to place, she did not know where a letter would reach him. She does not make it quite clear how he knew that she was with child. She testifies that she did not see him again until some nine months after the baby was born, and that then she did not want to have an interview with him; but that her relatives persuaded her to allow him to call, in the hope that he would right the wrong he had done her. At all events, they met. According to her account, he renewed his promise of marriage, and for the second and last occasion had sexual intercourse with her; with the result that in the fullness of time she gave birth to twins. If what she says is to be taken at its face value, there were only two acts of intercourse, with an interval of 18 months between them; but they brought into the world an aggregate of three children. She testified that Holt never spent a night or took a meal with her.

The question for determination is whether her testimony left it possible for reasonable men to believe that she had not been guilty of "open and notorious illicit cohabitation" with Holt, within the meaning of that phrase as found in the act of Congress. The word "cohabit" is used in the law in many different senses. Sometimes, as in the Louisiana statute providing for the punishment of incest, or in that of New York describing the circumstances under which one who was under the age of consent when he or she went through the marriage ceremony may validate the union after arriving at that age, it is substantially the equivalent of sexual intercourse, whether on one occasion or on many, and no matter how little anybody but the parties may have had an opportunity to know or suspect it. State v. Freddy, 117 La. 122, 41 So. 436, 116 Am. St. Rep. 195; Herrman v. Herrman, 93 Misc. Rep. 315, 156 N. Y. S. 688. On the other hand, where a court is asked to presume marriage from the fact that the parties cohabited together, something more than even frequent and habitual sexual intercourse must be shown. They must have so lived and acted that, to those knowing them, their relations appeared to be those of husband and wife. Yardley's Estate, 75 Pa. 207. In short, as was said in a Minnesota case: "In order to give it [the word 'cohabit'] proper effect in any given case, regard must be had to the subject-matter to which it relates, to the situation and conditions in respect to which it is used, and to the explanatory and qualifying language accompanying it." State v. Gieseke, 125 Minn. 497, 147 N. W. 663.

For many years the right of a pensioned widow of a deceased soldier to her pension ceased upon her remarriage. Experience proved that a not inappreciable number of women pensioners cared more for their pensions than they did for their reputation or their chastity, and as a consequence became in everything but name the wives of other men, although they were careful to avoid going through any marriage ceremony with them. To put an end to such a state of things, Congress incorporated in the second section of the Act of August 7, 1882, 22 Stat. 345 (Comp. St. § 8989), the declaration that "the open and notorious adulterous cohabitation of a widow who is a pensioner shall operate to terminate her pension from the commencement of such cohabitation." Thirty-five years later, in 1917, and after the act of 1882 had in practice been many times construed and applied by the Pension Bureau and the Department of the Interior, Congress took over into the War Risk Insurance Act (section 22, as added by Act Oct. 6, 1917, § 2 [Comp. St. § 514mmm]), its language, except that for "adulterous" it substituted the broader word "illicit." The government contends that long before 1917 the rulings of the Pension Bureau and the Department of the Interior had given to this legislative provision a construction broad enough to sustain the ruling below, and that Congress in re-enacting it must have used it in the sense which it had acquired in pension practice.

In 1885, in the case of the widow of George Martin (270, 571, Digest 1885, p. 19), it was held that there could be no stronger proof of open and adulterous cohabitation than the birth out of wedlock of two bastards. This ruling was followed in that of Mary C. Miller, 1 Pension Decisions, 171, in which there was but one illegitimate child, but in which there were other circumstances tending to show cohabitation. Two years later, the case of one Mary E. Bocke was ruled upon. She had given birth to an illegitimate child. Her reputation in the community in which she lived was good, both before and after the coming of the child, except as it was necessarily affected by that incident. She testified without contradiction that she had not lived with any man in the more general sense of that term, but in the winter of 1882 she expected to be married to one K., and at one time she lost her senses seemingly and was indiscreet with him. This indiscretion resulted in the birth of a son in September, 1883. K. left at that time, and she had not since heard of him. She said that, except as already stated, she had not acted in the relation of wife to

him. The department cited the case of the widow of George Martin, supra, and held that *one* illegitimate child was as convincing proof of open and adulterous cohabitation as *two* could have been.

In 1891 the Case of Louisa H. Pratt, 5 Pension Decisions, 93, came before the Department. She was a widow, and during her widowhood gave birth to an illegitimate child. None of the witnesses knew or suspected who the father was, and the widow refused to give any information. It was held that "giving birth to an illegitimate child is not sufficient evidence to establish" "open and notorious adulterous cohabitation," but it may be a strong circumstance, when connected with other conduct showing improper relations with some person; but, in the absence of other proof, it is not sufficient to bring the appellant within the provision of the statute. It may show adultery or fornication, but certainly not "open and notorious cohabitation."

A subsequent case in which the facts were not unlike those with which we are now concerned was that of Eliza Fain, 7 Pension Decisions, 572. The applicant in that case had since her husband's death given birth to two illegitimate children, one in 1886 and one in 1890. She contended, however, that the cohabitation of which these children were the result was not open and notorious and "did not disturb the neighbors in the community in which she lived." The department cited with approval from the case of Mary C. Bocke, supra, the statement that the words "open and notorious adulterous cohabitation" mean "immoral and licentious acts of an open and adulterous character." It then went on to say that such acts, though secret in the commission, are rendered "open and notorious" "when followed by the birth of children out of wedlock." In that case the claimant admitted that the same man was the father of both the children, that he visited her at intervals from some time prior to the birth of the first child to some time subsequent to the birth of the second. It was held that "no other evidence" was "necessary to establish open and notorious adulterous cohabitation within the meaning of the act." The inconsistent prior cases were overruled.

So far as we can learn, the department and the bureau have ever since adhered to the construction of law so set forth. The contention of the government is that when Congress, in 1917, re-enacted the provision of the act of 1882 with the broadening substitution of "illicit" for "adulterous," it must have intended to sanction the interpretation which had then for more than 20 years been uniformly given to it in practice. In the instant case, we need not go further than to say that we think the department was right in holding that the birth of illegitimate children to the widow is convincing evidence that she was living in "open and notorious illicit cohabitation." The act of sexual intercourse is never open. Indulgence in it becomes open and notorious from other circumstances, among which its result in the birth of children is of all the most convincing. When a woman has three illegitimate children by the same father she has in the sense of the statute illicitly cohabited with him, and when the community knows of their birth and that she is their mother that cohabitation has become open and notorious.

Affirmed.