**ROBINSON v. UNITED STATES et al.**

District Court, W. D. Louisiana, Shreveport Division. March 4, 1929.

No. 1724.

R. G. Chandler and W. B. Chandler, both of Shreveport, La., for plaintiff.

Philip H. Mecom, U. S. Atty., and J. Fair Hardin, Asst. U. S. Atty., both of Shreveport, La.

Frank E. Murphy, Robert Roberts, Jr., C. D. Egan, and C. F. Currier, all of Shreveport, La., for various other defendants.

DAWKINS, District Judge. This suit is to determine who is entitled to the proceeds of a certain war risk insurance policy in the sum of $5,000 upon the life of Preston Robinson, Jr., a colored soldier who died in the service on February 16, 1919. The original action was brought by the beneficiary named in the policy claiming to be his lawful wife by virtue of a marriage celebrated January 3, 1918. She alleged that at the time of her said marriage deceased had an undivorced wife, but which fact was unknown to petitioner, who acted "in perfect good faith and honestly believed that she was contracting a valid and legal marriage"; and that under the law of Louisiana, where the marriage took place, she is accorded all of the rights of a lawful wife.

Defendant the United States filed an exception of no right or cause of action, based upon the affirmative allegation in the petition that deceased had a lawful wife at the date of his alleged marriage with petitioner, taking the position that the Act of Congress contemplated that only a lawful wife should be entitled to be made beneficiary and that the law of the state as to putative marriages should not be recognized. At the instance of the government, there were finally brought into the suit the first wife of deceased, Marie Singleton, his father, brothers, and sisters, being all of those who could, under the law, lay claim to the insurance. By amendment, plaintiff claimed in the alternative the insurance upon the ground that the proceeds of the policy, if she should be denied recovery as the named beneficiary, would fall into the community alleged to exist between her and deceased, all of which she would be entitled to receive; and further, in the alternative, if not permitted to receive it all upon the theory just mentioned, then the proceeds under the state law should be divided equally between petitioner and the first wife, Marie Singleton.

While the government is a mere stakeholder and admits that the money is due some one of the several classes of claimants, it has really championed the claims of the blood relatives of the deceased. It averred that the plaintiff was not entitled to recover because

Preston Robinson had not been divorced from Marie Singleton, which fact it also charged was well known to petitioner; and further, for the reason that at the death of Preston Robinson and for many months thereafter, plaintiff was "living in open and notorious cohabitation with one Max Franklin at or near Bagley, Louisiana, which conduct on the part of plaintiff operated to terminate her rights to the insurance under Paragraph 5 of Section No. 22 of the War Risk Insurance Act of October 6, 1917 (40 Stat. 401)."

Both Marie Singleton and the blood relatives of deceased joined in these defenses, and the latter as well as the government averred that the first wife had likewise since the death of Preston Robinson lived in open and notorious illicit cohabitation with one Ike Leshay, and for this reason was not entitled to the proceeds of the policy as the lawful wife of deceased.

The government further averred that it had already paid to plaintiff the sum of $242.32 before it knew of the facts alleged herein to defeat her right to the insurance, and after such discovery it had paid to the father of the deceased, Preston Robinson, Sr., the sum of $700.50, under the belief that he was justly entitled to receive it, and for both of which sums it asked for judgment in reconvention in the event it should be held that other persons are entitled to recover under the policy.

At the trial the plaintiff also filed a plea of unconstitutionality as to the provision of the Act of September 2, 1914, 38 Stat. 712, as amended by the War Risk Insurance Act of October 6, 1917, 40 Stat. 398, under which the forfeiture was claimed, further alleging: "That the Act known as 'The War Risk Insurance Act' as amended by the Act of June 7, 1924 (43 Stat. 607, 38 USCA § 421 et seq.), and the Act of March 4, 1925 (43 Stat. 1302, 38 USCA § 424 et seq.), is retroactive in its operation and is the law applicable to this case."

As thus made up, the case here involves a contest between plaintiff, the beneficiary named in the policy, the first wife, Marie Singleton, and the father, brothers, and sisters, lawful heirs of the insured.

The questions raised are as follows:

(1) Should a federal court, in construing the acts of Congress with regard to war risk insurance, apply the state law that a putative wife, or one marrying another who was legally incapacitated to contract a second marriage, where she acted in good faith and in ignorance of the first marriage, is entitled to the rights of a legal spouse?

(a) As a matter of fact, has plaintiff shown good faith in contracting this marriage?

(2) If the plaintiff is not permitted to recover as the named beneficiary, did the proceeds of the policy under the War Risk Insurance Act fall into the matrimonial community of the state law, or should it be treated as separate property and go to the blood relations of deceased?

(3) Whether the lawful wife of the deceased, who was not named in the policy, can claim the proceeds as such where the beneficiary is a bigamous wife.

(a) As a matter of fact, has the first wife been guilty of living in open and notorious illicit cohabitation with other men since the death of Preston Robinson, Jr.?

(4) What, under section 22 of the Act of October 6, 1917, constitutes open and notorious illicit cohabitation?

(5) Was the provision of the act just mentioned constitutional?

■ I think the effects of the attempt to marry of plaintiff and deceased must be determined by the Louisiana law. The Revised Civil Code of Louisiana provides as follows:

"Art. 117. (119). Putative Marriages. The marriage which has been declared null produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith."

"Art. 118. (120). Id. If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor and in favor of the children born from the marriage."

Not only are these articles clear in declaring that all of the rights and civil effects shall be accorded to persons acting in good faith, but the decisions of the Louisiana courts are uniform in sustaining that view. Gauff v. Johnson, 161 La. 975, 109 So. 782; Miller v. Wiggins, Sheriff, 149 La. 720, 90 So. 109; Jones v. Powell Lbr. Co., 156 La. 767, 101 So. 135; Smith v. Smith, 43 La. Ann. 1140, 10 So. 248; Jones v. Squire, 137 La. 883, 69 So. 733; Waterhouse v. Star Land Co., 139 La. 177, 71 So. 358; Ray et al. v. Knox, 164 La. 193, 113 So. 814; Hubbell v. Inkstein, 7 La. Ann. 252.

Hence I see no reason why the federal courts should not apply them in a case of this kind.

■ As to the good faith of plaintiff, I think the evidence preponderates in her favor. It is true that considerable testimony was introduced to show that plaintiff had lived in the same community where the deceased and his first wife, Marie Singleton, resided, for a period of about a year; but there

is no proof that either ever knew or heard of the other except inferences and the later extraordinary testimony of certain of the interveners herein, brothers and sisters of the deceased, who are seeking to recover this insurance by defeating the claim of plaintiff. I, of course, refer to the evidence of Leamon Robinson and his brother and sister. Their statements are not consistent with ordinary human conduct, and their demeanor on the witness stand impressed me rather strongly that they were not telling the truth about matters that had happened some 10 years before, when two of them were small children and the other about 20 years of age. On the other hand, the testimony of plaintiff was very straightforward and apparently void of any attempt at coloring. She admitted going with Preston Robinson, Jr., to see her prospective father-in-law, but stated that they carried an invitation to the wedding and nothing was said about Preston having a lawful wife. On the other hand, Leamon Robinson purports to quote in detail a conversation between plaintiff and her subsequent father-in-law, but in doing so I think he overdid it, for it is rather hard to believe that if Preston Robinson, Sr., his son, and the girl whom he was about to marry knew that he could not lawfully do so, they would have gone ahead with the formal and public celebration of the second marriage in the manner as was done. Of course, Preston Robinson, Jr., is dead, and the testimony of his father, who is said to live in California, has not been taken. I am disposed to believe that the justice of the peace who made a practice of drawing up "separation agreements" between husbands and wives in this colored community provided, as he says he thinks he did, one for Marie Singleton and the deceased, and that even the latter believed he had a right to remarry. It does not otherwise seem reasonable, as above stated, that he would have married again in the manner as was done if he had thought he would be subject to criminal prosecution. Marie Singleton testified that she went to Texas shortly after her separation from the deceased and that she never knew the plaintiff. The preacher who performed the marriage ceremony between plaintiff and deceased was the pastor of the church to which they belonged, and he knew nothing of the former marriage.

My view is that plaintiff at least was in good faith, and having reached this conclusion it is my opinion that the law gives her the status of a putative wife, entitling her to the proceeds of the policy, unless it has been shown that she forfeited the right because of misconduct.

The provision of the Act of October 6, 1917 (40 Stat. 401), in question reads as follows: "Provided, That marriages, except such as are mentioned in Section forty-seven hundred and five of the Revised Statutes, shall be proven in compensation or insurance cases to be legal marriages according to the law of the place where the parties resided at the time of marriage, or at the time when the right to compensation or insurance accrued; and the open and notorious illicit cohabitation of a widow who is a claimant shall operate to terminate her right to compensation or insurance from the commencement of such cohabitation."

I think the word "cohabitation," as used in this statute, involves more than illicit intercourse. I think it was intended to apply to those living together in the relationship of husband and wife without the formality of a marriage, and that it was inspired by reasons similar to those in other statutes relating to pensions for widows of deceased soldiers. It was found that in many instances the wives of deceased soldiers. in order to avoid losing their pensions by remarriage, would establish relations with men equivalent to marriage in all respects except the formalities of a lawful ceremony, and such provisions were intended by Congress to prevent this method of circumventing the law. It is apparent that it was not intended to deprive such beneficiaries of the benefits of compensation or insurance merely because of immoral conduct or isolated instances of illicit relations with men, or it would have been done in unmistakable language as Congress undoubtedly had the power to do. It rather chose to use the expression "open and notorious illicit cohabitation," which means a state of living together as husband and wife in a manner open and known to the community in which the parties live. The legislators were not satisfied to use the expression "illicit cohabitation" alone, but further qualified the provision with the very strong and forceful adjectives "open and notorious." "Open" is defined by Webster's Unabridged Dictionary as: "Not concealed or secret; not hidden or disguised; exposed to view and knowledge; revealed, apparent; as open schemes or plans; open shame or guilt."

And the same authority defines "notorious" as: "Generally known and talked of by the public; universally believed to be true; manifest to the world; evident,—usually in

an unfavorable sense; as a notorious thief; a notorious evil or vice.".

In the case of King v. U. S. (C. C. A.) 17 F.(2d) 61, the court cited at length decisions of the Pension Bureau and held that the birth of three illegitimate children, two of which were twins, was sufficient proof of open and notorious cohabitation to defeat the right to such insurance, although there appeared very little evidence to show that there had been any cohabitation between the parties. I cannot agree with the reasoning of that decision, which I believe was stronger even on its facts than the present one. The courts should not abdicate their constitutional duty of interpreting and construing statutes because departmental agencies, influenced no doubt by good motives, but apparently controlled more by a purpose to exercise a sort of moral censorship than by logic and reason, have decided contrary to the plain meaning of a law. The birth of illegitimate children is undoubtedly evidence of illicit sexual relations, but it is not the proof of such acts which justify a denial of the benefits to the widow, but facts and circumstances which show, in the language of the law, "open and notorious illicit cohabitation" with men, or using the ordinary definition of the word "cohabit," the phrase would read: "Open and notorious illicit living together as husband and wife." In this case plaintiff admitted that she had given birth to two children, the first of which the law undoubtedly presumed to have been that of Preston Robinson, Jr., whom she believed to be her husband, as it was born about nine months after their marriage and after they had lived together for three or four months before he went into the army. The second child came in August of the next year, and, since the husband died February 16th of that year, (1919), was probably conceived while he was yet alive. She admitted she had had improper relations with other men after her husband's death and did not know the father of her last child, but, as above indicated, in my opinion this did not prove that she had lived with them openly and notoriously as husband and wife. No other witness testified to any such acts or cohabitation except to corroborate her statement that she had given birth to a second child after the death of her husband, which, as stated, in all probability was conceived while he was yet alive and before she had become a widow.

My conclusion is that no sufficient basis has been shown for the forfeiting of her rights as a beneficiary under the policy in this case. The provisions now sought to be invoked against plaintiff have been repealed by subsequent enactments of Congress.

Under the views above announced, it becomes unnecessary to pass upon the other questions raised in this case. The plaintiff, therefore, should have judgment for the installments accruing from the time that the Bureau ceased paying her, and the government should in turn have its right reserved to sue Preston Robinson, Sr., for the recovery of the sums paid to him. The latter is represented in this court by a curator only, and there being no personal appearance no judgment, of course, can be rendered against him in this proceeding.

Proper decree may be presented.