296 So.2d 390 (1974)
Succession of Ed BARBIER also known as John Luna.
No. 6269.
Court of Appeal of Louisiana, Fourth Circuit.
June 6, 1974.
Wilmon L. Richardson, Baton Rouge, Freddie B. Warren, Jr., New Orleans, for plaintiffs-appellants.
Lillian M. Cohen, New Orleans, J. Joseph Blotner, Gretna, for defendant-appellee.
Before SAMUEL, STOULIG and MORIAL, JJ.
MORIAL, Judge.
On February 20, 1970 Ed Barbier, also known as John Luna, died intestate leaving an estate of $43,808.23. His succession *391 was opened on March 16, 1970 and Lester Barbier, one of his sons, was appointed administrator. On November 24, 1971, Juanita Barbier Carroll filed a petition in the succession asking that the administrator be ordered to file an annual accounting, to which the administrator responded by filing a petition asking that Juanita Barbier Carroll be declared an incompetent heir. The trial court ordered the petition in opposition to heirship dismissed and declared Juanita Barbier Carroll to be the putative child of Ed Barbier and as such entitled to share equally in his succession. From this judgment, Lester Barbier and Eddie Barbier, Jr., appeal.
The record reveals that on December 23, 1925, in Ascension Parish, Ed Barbier married Clara Daggs, and thereafter established a matrimonial domicile in New Orleans. On June 24, 1927 the first of their children, Eddie Barbier, Jr., was born. Lester Barbier, the second and last child of their union was born on March 9, 1929. During the next ten years Barbier lived sporadically with his wife, and in 1936 he began courting Gladys Poche, a fifteen year old girl. On April 17, 1937, Barbier married Gladys Poche, and on March 24, 1938, Juanita Barbier, the sole issue of their marriage was born. Barbier failed to obtain a divorce from his first wife, Clara Daggs until May 22, 1941. In 1942, Gladys Poche left Barbier, and on April 14, 1944 he obtained a divorce from her.
The sole issue in this case is whether Gladys Poche, now known as Mrs. Young, was in good faith and reasonably believed Ed Barbier to be a single man at the time of their marriage. No dispute exists that in 1937 Barbier was still legally married to his first wife, and hence a legal impediment to their marriage existed. However, Article 117 of the Revised Civil Code provides:
The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith.
Article 118 provides further:
If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage.
In Succession of Chavis, 211 La. 313, 29 So.2d 860, 862 (1947) the court interpreted these articles and said:
"It may well be that unconfirmed rumors or mere suspicions may reach a party and such as may even cause some question or doubt to arise as to the validity of a marriage, yet it would appear under our jurisprudence that under certain conditions a party may be in `good faith' so long as no certain or authoritative knowledge of some legal impediment comes to him or her, but to just what extent a party is called upon to make an investigation to ascertain whether there exists any legal impediment to his or her marriage in order to establish his or her status as a putative spouse, will depend ultimately upon the facts and circumstances in each individual case. Our courts have simply said that `a party alleging good faith can not close her ears to information or her eyes to suspicious circumstances. She must not act blindly or without reasonable precautions.' For a detailed and lengthy discussion on our jurisprudence on these questions, see: Smith v. Smith, 43 La. Ann. 1140, 10 So. 248; Wiley v. Stewart, 145 La. 1081, 83 So. 260; Miller et als. v. Wiggins, 149 La. 720, 90 So. 109; Ray v. Knox, 164 La. 193, 113 So. 814; Dion v. Traders & General Insurance Co., La.App., 183 So. 553; Succession of Glover, La.App., 153 So. 496; Succession of Thomas, 144 La. 25, 80 So. 186."
In Chavis the court also reiterated the well established rule that the burden of proof is upon the one alleging bad faith and any doubt must be resolved in favor of finding good faith. The Chavis court held that even though the second wife might have heard that her husband was married to another, when the circumstances were viewed *392 as a whole, the wife was undoubtedly in good faith, and therefore the putative spouse of her husband. This court is also compelled to so hold in this case.
Gladys Poche first met Barbier when she was fifteen years old and living at home under the strict parental authority of her father who was a deacon in the church. The evidence conflicts as to how exactly Gladys first met Barbier, but it appears that he was originally brought to the house by a fellow longshoreman and long-time family friend, Leon Bordelon. Some time during their eight month courtship, a relative, Mrs. Sarah Lewis, informed the family that she had heard a rumor that Barbier was married. Mrs. Gladys Young (Gladys Poche) testified that her father was extremely upset by this rumor and immediately confronted Barbier who fell on his knees, raised his right hand and swore that he had never been married. Barbier and Poche also had a discussion in which Poche satisfied himself that Barbier was telling the truth. He then informed Gladys that she should treat Barbier with as much respect as she had previously. To fully satisfy themselves that Barbier was not married, the family had Bordelon investigate the matter for them. Subsequently he reported back to the family that he could find no substance to the rumor, and believed Barbier to be a single man. As the court said in Chavis at p. 863:
"It must be further noted that what constitutes `good faith' as used here is not an absolute quality but is relative, and depends ultimately upon the facts and circumstances in each individual case."
In weighing the facts and circumstances as a whole, this court must conclude that Gladys was in good faith at the time of her marriage. She was only sixteen at the time of her marriage and had lived a sheltered life at home. Testimony on the record indicates that her parents thought Barbier to be a "fine gentleman," and obviously consented to her marriage, because being a minor at the time, Gladys could not marry without their consent. Furthermore, her mother and Bordelon signed as witnesses to the wedding. Apparently, Gladys trusted her father and felt that all had been done to ascertain the truth of the rumor; she and her family believed it to be just thata rumor.
The thrust of appellants' argument is that Gladys and her family should have made a more extensive inquiry into the truth about Barbier's marital status, and they cite Succession of Hopkins, 114 So. 2d 742 (La.App. 1st Cir. 1959) and Prieto v. Succession of Prieto, 165 La. 710, 115 So. 911 (1928) in support of this contention.
In Succession of Hopkins, the court found the second wife in bad faith only because she had actually read letters from the first wife, and because the decedent had been living with another woman at the time of the marriage. She also had been told by a relative that he knew Hopkins still had a legal wife. When confronted with circumstances such as these, the second wife certainly could not have been in good faith, and at the very least she should have made some independent inquiry to ascertain whether her intended husband had been divorced. Gladys had no specific and independent knowledge of her own, only rumor, and furthermore the family including Gladys made as much of an inquiry as their capabilities permitted them to make.
The circumstances in Prieto also clearly showed bad faith. The second spouse knew that his intended spouse had been married, but chose to marry her anyway. In both cases the parties knew that the other had been married, and the court simply said that a declaration of divorce was not enough to create a presumption of good faith. In this case, the Poches had no knowledge in fact of Barbier's marriage. They were not relying on Barbier's declaration of divorce, but rather on his declaration that he had never been married. Hence Hopkins and Prieto are inapplicable.
*393 Appellants' other contention is that as a matter of fact, Gladys knew of the existence of Barbier's first wife. Conflicting evidence regarding this point is in the record, but appellants simply failed to sustain the burden of proof. If any doubt exists concerning bad faith, it must be resolved in favor of good faith. Jones v. Squire, 137 La. 883, 69 So. 733 (1915). Exactly when Gladys found out that Barbier was still married, is a point around which conflict centers. Mrs. Young testified that indeed she did learn of Barbier's first marriage, but only after she was already married and her child conceived. The trial judge obviously found Mrs. Young to be the most credible witness. His finding of fact is one we feel compelled not to overturn.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.